THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RONNIE STEWART, Appellant.

Second Department, March, 14, 1983

APPEARANCES OF COUNSEL

*William E. Hellerstein (Jill F. Moscowitz* of counsel), for appellant.

*John J. Santucci, District Attorney (Naomi Werne* and *Richard G. Denzer* of counsel), for respondent.

OPINION OF THE COURT

*Per Curiam.*

On October 29, 1978, while walking home from a basketball game at about 6:15 P.M., Linda Bozier was robbed in Queens, New York. A man, identified at trial as the defendant, approached her, held a gun to her head, and forcibly took from her a tape recorder that she was carrying. A few days later Miss Bozier saw defendant on the street, recognized him as the perpetrator of the crime and so informed the Lefrak City security patrol, who placed defendant under arrest.

The arresting officer, Carl Zayas, testified that after the arrest he searched defendant and found $101. He further testified that at a subsequent court appearance defendant approached him in a corridor of the courthouse and informed him that he had spoken with Linda Bozier and had

offered to return her radio or to pay her $200. Miss Bozier allegedly responded by telling defendant that he "was crazy".

Through his testimony and the testimony of two others, Thomas Turner and Brian Jordan, defendant presented an alibi defense. The three of them were allegedly together during the afternoon and evening of October 29, 1978. Sometime before 5:00 P.M. they went to the home of Michael Locke, the owner of a frankfurter stand, for whom all three worked. For the next several hours they were in the basement of Locke's building, cleaning Locke's vending wagon. When they finished, at about 7:00 P.M., they went upstairs to Locke's apartment, where they remained until 11:00 P.M.

As the above recitation illustrates, this is a case which, in effect, could have tried itself. The facts were uncomplicated, involving two disparate stories for the jury's resolution. Unfortunately, the trial was plagued by what we consider outrageous prosecutorial misconduct, depriving defendant of a fair trial and requiring reversal.

The first instance of impropriety occurred during presentation of the People's case. After Linda Bozier had testified that she had not heard defendant speak since the night of the robbery, the prosecutrix, despite repeated objections by defense counsel and admonitions from the court, attempted to elicit testimony from Linda and a police officer to the effect that defendant had called the Bozier home and had spoken with Linda's mother. These witnesses were obviously incompetent for this purpose. When Linda's mother, Catherine Bozier, took the stand, the prosecutrix asked whether she had ever spoken on the telephone with defendant. Repeatedly, despite sustained objections, the prosecutrix asked the same question in various forms, without ever attempting to establish whether Catherine Bozier could identify defendant's voice. Without such a foundation, these questions were improper (see, generally, Fisch, New York Evidence [2d ed], § 17). While the prosecutrix' questions may have been occasioned by ignorance of the rules of evidence, we must be mindful of their potentially prejudicial impact. That defendant allegedly communicated with the victim's mother would tend to support

Officer Zayas' testimony that defendant informed him that he had offered to give the victim her radio back.

The prosecutrix' cross-examination of the defense witnesses can hardly be excused as resulting from ignorance of the law. Over and over again, in flagrant disregard of sustained objections and the court's admonitions, the prosecutrix asked defendant and his witnesses whether they took drugs, whether they were members of a gang known as "Righteous" and whether they sold drugs to little children. The following, taken from the record of defendant's testimony, is illustrative:

"Q [prosecutrix]: Mr. Stewart, do you know whether Thomas Turner uses drugs?

"MR. MARSILLI [defense counsel]: Objection.

"THE COURT: Sustained.

"Q: Did you ever see him possess marijuana?

"THE COURT: Sustained.

"Q: Do you know what the 'Righteous Group' is?

"MR. MARSILLI: Objection.

"THE COURT: Sustained.

"Q: Isn't it a fact that aside from your selling the hot dogs from the stand, you dispense marijuana to children in Lefrak City?

"MR. MARSILLI: Objection.

"THE COURT: Sustained."

The same sort of questions were previously asked of defendant's witnesses. The prosecutrix was apparently of the view that the sustained objections to these questions were of no moment, and that she could ignore the court's rulings by asking virtually the same questions over again of different witnesses. While objections to these questions were sustained, the very asking of them could possibly have led to prejudice. Such conduct borders on the contemptuous (Judiciary Law, § 750).

It is, of course, true that a witness may be impeached "by inquiry into prior acts of misconduct which tend to discredit the witness' character and show him or her to be unworthy of belief" (*People v Hunter,* 88 AD2d 321, 322).

Such questions are proper where the alleged prior acts involved moral turpitude, and they are asked in good faith, with a reasonable basis in fact (*People v Schwartzman,* 24 NY2d 241, 244, cert den 396 US 846; *People v Hunter, supra*). However, matters which have little, if any, relation to credibility but which possess a significant potential for prejudice should be avoided (*People v Sandoval,* 34 NY2d 371, 375).

Whether defendant or his friends may, at times, smoke marihuana is hardly a notable fact in this case, absent evidence that they were under the influence of that drug on the date of the robbery or during their testimony (see *People v Freeland,* 36 NY2d 518; cf. *People v Duffy,* 36 NY2d 258). Nor are questions as to gang membership proper, absent a connection between such membership and the crime or crimes for which the defendant is being tried (*People v Torres,* 72 AD2d 754). Selling drugs to children, on the other hand, is a serious matter, properly a subject for impeachment purposes, provided that there is a good-faith basis. In this case the record reveals none. The fact that Turner apparently had once been arrested for loitering for the purpose of using drugs, and that Jordan had previously been arrested for robbery, upon which the People rely, do not constitute an adequate foundation.

The prosecutrix also ignored the court's instruction with regard to questions concerning Michael Locke, the owner of the frankfurter stand. Her efforts along this line were transparent attempts to have the jury infer that Locke was involved in some sort of illicit activity which somehow reflected upon defendant's credibility. Thus, after the court had told her not to pursue any line of questioning regarding Locke, the following occurred:

"Q: Mr. Locke is in the recording business also, isn't he?

"MR. MARSILLI: Objection.

"THE COURT: Sustained.

"Q: Isn't he?

"MR. MARSILLI: Objection.

"Q: Isn't it true that he has a recording studio in his apartment?

"MR. MARSILLI: Objection.

"THE COURT: Sustained.

"Q: Isn't it true that he just laid down $5,000 for some of his recording equipment?

"MR. MARSILLI: Objection.

"THE COURT: Sustained.

"Q: Where does he get the money from, a hot dog stand?

"MR. MARSILLI: Is this a court of law? What are we doing?

"THE COURT: Miss * * * you are now directed not to pursue that line."

A persistent unwillingness to abide by the court's rulings was demonstrated by the prosecutrix with regard to questions about another robbery charge which had previously been dismissed. The defendant had briefly mentioned this other charge on his direct testimony, in reference to the reduction of his bail. On cross-examination the court allowed a limited inquiry into this other charge because defendant himself had mentioned it, but it refused to allow detailed questioning. Nonetheless, on two more occasions the prosecutrix attempted to draw out the details of the charge, prompting the court, while sustaining an objection, to ask: "Didn't you hear me before?"

Other examples of inappropriate questioning appear in the record, such as an attempt, without any apparent basis, to link the money found on defendant at the time of his arrest with proceeds of the robbery (see *People v Symbato,* 72 AD2d 780), and cross-examination of defendant as to whether Officer Zayas was lying (*People v Delgado,* 79 AD2d 976). The prosecutrix reserved for her summation her final sally. She began her remarks by stating that her job was "protecting the innocent and prosecuting the guilty", thereby placing the status of her office on the side of a guilty verdict. She went on to argue that Officer Zayas had no motive to lie and "told you the truth about what happened". She denigrated the defense by asserting that the testimony of defendant and his witnesses was incredible and unworthy of belief. Finally, she stated, in effect, that an acquittal would be equivalent to a finding that the District Attorney's office, herself and all the witnesses were liars and had fabricated the People's case.

Comments in a summation such as were made here have repeatedly been disapproved by this court (see, e.g., *People v Blackman,* 88 AD2d 620; *People v Whitehurst,* 87 AD2d 896; *People v Santiago,* 78 AD2d 666; *People v Alston,* 77 AD2d 906; *People v Schaaff,* 71 AD2d 630; *People v Goggins,* 64 AD2d 717). While some of the prosecutrix' comments were not objected to, review is still appropriate in the interest of justice. In our view this summation was inflammatory, bore no relationship to the issues in the case, and went beyond a fair response to defense counsel's summation.

Rarely has this court seen a case where the prosecutor has allowed himself or herself to be so led astray in the zeal of obtaining a verdict. We have here recounted in detail instances of the prosecutrix' misconduct in the hope that our disfavor will be noted and that those charged with the duty of participating as advocates in criminal trials will approach their responsibility in an appropriate manner.

LAZER, J. P., GIBBONS, NIEHOFF and BOYERS, JJ., concur.

Judgment of the Supreme Court, Queens County, rendered June 25, 1979, reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered.