THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LEONARD MOTT, Appellant.

Fourth Department, July 11, 1983

APPEARANCES OF COUNSEL

*David A. Murante* for appellant.

*Donald O. Chesworth, District Attorney (Michael Nelson* of counsel), for respondent.

OPINION OF THE COURT

DENMAN, J.

The deliberate and pervasive pattern of prosecutorial misconduct at defendant's trial for conspiracy in the first degree deprived defendant of a fair trial and compels reversal and a new trial.

Defendant Leonard Mott and Angelo Nuccie were indicted for conspiring to murder Robert Phillips, who was scheduled to be a witness in the Federal trial of Herman Peterson on charges of drug trafficking. An unindicted coconspirator, Bernard Siplin, informed police of the plot and was furnished with an electronic listening device for the purpose of recording conversations relating to the conspiracy. The police placed Siplin under surveillance and, after he had recorded relevant conversations, apprehended the three coconspirators. Nuccie was tried sepa-

rately and convicted as charged (*People v Nuccie*, 57 NY2d 818).

The proof against defendant consisted mainly of the testimony of Siplin and the taped conversation which was played for the jury. Inasmuch as Siplin himself had been engaged in the alleged conspiracy and admitted to supporting his drug addiction by stealing, his motive for testifying against defendant and the validity of his testimony were open to question. Additionally, portions of the taped conversation were inaudible, the speakers nonidentifiable and the court ruled that a transcript of the conversation in the hands of the District Attorney was inadmissible. Viewed in the context of this rather tenuous proof, the conduct of the District Attorney must be examined with precision to discern whether his trial tactics diverted the attention of the jury from the issues and tended to distort the facts and prejudice the minds of the jurors. We find that the improper and unprofessional conduct of the Assistant District Attorney was so egregious that we cannot say that the jury reached a verdict on the basis of the evidence rather than on extraneous ideas implanted by the prosecutor.

We recite only a few examples illustrative of the manner in which the trial was conducted. From his opening statement through his summation, the prosecutor attempted to establish that the motive for the plot to kill Phillips was that Herman Peterson was Mott's drug supplier and his superior in a drug operation, and that Mott was seeking to protect him. Yet the record reveals not one shred of evidence to support that theory. Repeated statements by the prosecutor tending to connect Mott with Peterson in a drug operation were objected to by defense counsel. Despite the fact that the court sustained the objections, the prosecutor persisted. During summation the prosecutor relentlessly pursued that theme, attempting to show that Peterson had orchestrated the entire scenario, yet defendant's motions for a mistrial were denied. Such conduct is not only improper and highly prejudicial, it borders on the contemptuous and merits strong disciplinary action (see *People v Alicea*, 37 NY2d 601, 604; *People v Stewart*, 92 AD2d 226, 228).

During his cross-examination of defense witnesses, the prosecutor misstated and distorted their testimony and insinuated that their testimony had been coached by defendant's wife who was present in the courtroom. This impropriety was flagrantly compounded on summation by the prosecutor's references to "Cecil B. DeMott" to highlight his characterization of defendant's wife as directing the defense case. This again occurred over the strenuous objections of defense counsel which were sustained by the court. He badgered, insulted and argued with defendant, who took the stand in his own defense, and accused defense counsel of coaching him and other witnesses. He asked defendant if he reported the proceeds of his burglaries to the welfare department since his wife was receiving assistance.

One of the most serious transgressions occurred in relation to the transcript of the taped conversation. The transcript had been prepared solely to apprise defense counsel of the statements which would unfold on the tape. The court ruled that it was inadmissible and instructed the court reporter to record only what she was able to hear from the tape which, incidentally, was nothing. On the day after the tape was played for the jury, an article appeared in the local newspaper quoting at length from the transcript and identifying statements as those of defendant and the other conspirators. Defense counsel moved for a mistrial on the ground that publication of the transcript created the potential for defendant's guilt to be determined on matter extraneous to the proof. The prosecutor admitted that he had given the transcript to a newspaper reporter and also to the court reporter to be included in the record despite the court's ruling that it was to be given only to defense counsel. When defendant's motion for a mistrial was denied, defense counsel moved to have the jury polled to determine if anyone had read the offending article. The court refused. Compounding his transgression, the prosecutor used the transcript during his cross-examination of the defendant referring to it continually in phrasing his questions so that the jury heard essentially all of the statements in the transcript. Finally, the prosecutor used the transcript during summation, waving it in front of the

jury box and quoting from it. The court's response to defense counsel's many motions for a mistrial was to state that he did not believe that any prejudice had been incurred and that he would leave the matter of the prosecutor's inflammatory remarks and improper behavior for appellate review.

The attitude and tactics of the prosecutor were unseemly and unprofessional in the extreme and violated the defendant's right to be tried in a fair and impartial manner consistent with the ends of justice. Both Federal and State courts have only too frequently had occasion to remind prosecutors that their function goes beyond that of a mere advocate and that they are charged with the responsibility of presenting competent evidence fairly and temperately, not to get a conviction at all costs (see, e.g., *People v Bailey,* 58 NY2d 272; *People v Zimmer,* 51 NY2d 390; *United States v Modica,* 663 F2d 1173). Because a prosecutor represents the State, his words and actions carry greater force and hold greater sway with a jury than those of a private attorney. "He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one" (*Berger v United States,* 295 US 78, 88).

The prosecutor here fell far short of that standard. His persistent inflammatory remarks, his insulting and browbeating manner with defense witnesses, his accusations against defense counsel, his repeated efforts to put matter not in evidence before the jury, his use of a transcript which had been ruled inadmissible, his improper use throughout the trial of the theme that defendant was involved in a drug operation, were the antithesis of those qualities which are contemplated in our jurisprudence when we speak of a defendant having a right to a fair trial.

The task facing an appellate court when reviewing instances of impropriety at trial is to determine whether the misconduct is so egregious that reversal of a conviction is required. Courts and commentators have wrestled with the problem of whether the remedy for a prosecutor's miscon-

duct should be to burden society with the cost and uncertainty of a retrial. Generally it has been held that such result is mandated only when the conduct has caused such substantial prejudice to the defendant that he has been denied due process of law. In measuring whether substantial prejudice has occurred, one must look at the severity and frequency of the conduct, whether the court took appropriate action to dilute the effect of that conduct, and whether review of the evidence indicates that without the conduct the same result would undoubtedly have been reached (see *Berger v United States, supra,* p 89; *United States v Modica,* 663 F2d 1173, 1181, *supra*). There is no question that the prosecutor's conduct in the case before us was severe and pervasive. Nor can we say that there was strong proof of defendant's guilt. Indeed, even with the improprieties committed, the jury deliberated 12 hours before reaching its verdict and then only after being told at midnight that they were going to be sequestered for the night.

Regrettably, the trial court was also woefully remiss in dealing with the District Attorney. The Judge completely abdicated his responsibility by failing to admonish the prosecutor and failing to make prompt curative instructions to the jury indicating the impropriety of the prosecutor's remarks and that the jury should ignore them. In *People v Galloway* (54 NY2d 396), the trial court's handling of similar incidents resulted in affirmance and gave rise to the court's comments that "the Trial Judge was a saving grace. Not chary about raising his own restraining hand, he handled most of the episodes promptly and forcefully, aborting prejudice by cutting short the arguments, or, in instances where he thought it appropriate, confining it to chambers" (*People v Galloway, supra,* p 399). In contrast, the Trial Judge here, by failing to curb the prosecutor's improper remarks, seemingly put the court's imprimatur on them in the eyes of the jury (see *People v Steinhardt,* 9 NY2d 267, 271). Instead of unequivocally directing the prosecutor to refrain from inflammatory remarks and other improper conduct, he merely told him that he was running a risk of reversal but that he would leave the matter for appellate review. Thus, like the situation in

*Berger v United States,* "the situation was one which called for stern rebuke and repressive measures and, perhaps, if these were not successful, for the granting of a mistrial. It is impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken" (*Berger v United States, supra,* p 85).

We recite merely a few instances in which the court could have redeemed the situation. When the District Attorney improperly gave the transcript of the taped conversations to the press, the court should have conducted an inquiry of the jury to determine whether any members had read the article. As we have had occasion to note in a similar context, "publicity * * * does not inevitably necessitate declaration of a mistrial. Such a result is warranted only in those instances where, after an exhaustive and probing inquiry of each affected juror, the court is of the belief that a fair and impartial determination cannot be reached. It was in the denial of the mistrial without conducting such inquiry that the trial court erred" (*People v Mordino,* 58 AD2d 197, 205). Here the court refused to conduct such inquiry, commenting that he would declare a mistrial if he believed that any of the jurors had read the offending article but requiring that defense counsel show some evidence that the jury had done so. How was this to have been accomplished without defense counsel asking the jury?

When, in defiance of the court's rulings, the prosecutor persisted in his attempts to introduce evidence of defendant's alleged connection with a drug operation, the court should have admonished him. Indeed, a sharp rebuke in front of the jury would have served a twofold purpose: It might have deterred the prosecutor from further comment on this subject and would have alerted the jury to the impropriety. Instead, the failure of the court to reprimand the prosecutor very likely served to indicate to the jury that his behavior and comments were entirely proper (see *People v Steinhardt, supra,* p 271).

With respect to the trial court, we note that its penchant for talking with jurors *in camera* without the presence of counsel would alone be grounds for reversal if it had been raised. During the course of the trial, some of the jurors

apparently went to the Judge and informed him of their desire to absent themselves from the proceedings. Reporting this to counsel, the court rather blithely stated in response to a defense motion for a mistrial that he was sure the jury could arrive at a fair verdict if counsel would only move the case along. After the jury had been deliberating for over 11 hours, a request for an instruction was communicated at 11:45 P.M. Before the jury was brought in, the court informed counsel that at 11:15 P.M. one of the jurors had come to see him, told him that he had' a nervous condition which made him apprehensive about spending the night away from home and asked for instructions which he thought would help him bring the jury to a verdict. The court apparently informed him that he could not give him such instruction *in camera* but that it would have to be done before the entire jury, the defendant and counsel. Not surprisingly, a request for the instruction was sent to the Judge shortly after the juror returned to the jury room. Defense counsel moved for a mistrial based on the entire episode and the court declared that he was sure that there would be no prejudice to defendant. Since no record was made of the conversation between the court and the juror, it is impossible to conclude that his sanguine view had any basis in fact. That error alone would be grounds for reversal (see *Snyder v Massachusetts*, 291 US 97, 105-106; *People v Ciaccio*, 47 NY2d 431, 436; *People v Eadie*, 83 AD2d 773).

In sum, the record makes abundantly clear that defendant's fundamental right to a fair trial was denied and his conviction must be reversed and a new trial granted. As the Court of Appeals stated in *People v Alicea* (37 NY2d 601, 605, *supra*), "Criminal trials are to be so conducted that the proof will be legal evidence, unimpaired by intemperate conduct, impertinent counsel and irrelevant asides, all of which obfuscate the development of factual issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence. Although every trial may not be impeccably conducted and free of some error, we will not tolerate trials where unadulterated unfairness and deceit have become the rule. Evenhanded justice requires more and, as the ultimate guardian of the

rights of the People and defendants in the State, we have a right to expect more."

DILLON, P. J., DOERR, GREEN and MOULE, JJ., concur.

Judgment unanimously reversed, on the law, and a new trial granted.