THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
HAROLD P. RUBIN, Appellant.

Fourth Department, April 12, 1984

APPEARANCES OF COUNSEL

*Lipsitz, Green, Fahringer, Roll, Schuller & James,* and *Herzfeld & Rubin, P. C.* (*Paul J. Cambria, Jr.,* and *Mary Good* of counsel), for appellant.

*Robert Abrams, Attorney-General* (*Edward J. Kuriansky, Robert Dublirer* and *Arthur G. Weinstein* of counsel), for respondent.

## OPINION OF THE COURT

SCHNEPP, J.

██ Following a nine-week trial defendant, a licensed podiatrist and an authorized Medicaid provider, was convicted of 1 count of grand larceny in the second degree (Penal Law, § 155.35) and 14 counts of offering a false instrument for filing in the first degree (Penal Law, § 175.35). All of the charges stemmed from accusations that he filed claims for care, services and supplies which he did not provide to his Medicaid patients. In our view, the principal issues before us relate to the theory of the grand larceny prosecution as embodied in the indictment, the expert testimony offered supporting that theory, and the court's explanation of that theory to the jury in its charge. In addition, defendant's claim that he was denied a fair trial because of prosecutorial misconduct merits scrutiny. For the reasons which follow, we conclude that the judgment of conviction should be modified by reversing defendant's grand larceny conviction.

The theory of the prosecution was not complex. Simply stated, the indictment charged defendant with grand larceny in the second degree committed during the years 1980 and 1981 by his billing the Erie County Department of Social Services in excess of $1,500 for care, services and supplies which he did not provide. He was also charged with the 14 counts of offering a false instrument for filing in the first degree by reason of the invoices he submitted for the services and foot appliances which he certified that he provided to 13 patients during this period. In four of these counts, defendant was accused of invoicing for services which were not performed, in six of casting and

fabricating foot appliances which were not furnished and in the remaining four of making false representations that no money or other consideration was received from patients or other sources.

At trial, 29 former patients of defendant testified concerning the medical treatment which they received. Received as exhibits were the invoices submitted by defendant for the podiatric services and the foot appliances which he claims he provided to these patients. Also received was a fee schedule detailing the amounts allowable to podiatrists for various procedures performed in the treatment of Medicaid patients. Discrepancies appear when the testimony of the patients as to the treatment they received and the schedule of permissible charges for that treatment are compared with the invoices submitted by defendant. In some instances, defendant charged for visits which the patients testified they did not make, and for treatment which they claimed they did not receive. In addition, the prosecutor contended at trial that in accordance with the fee schedule defendant was entitled to charge only the sum of $13.80 for each of the foot appliances which he furnished many of his patients, rather than the sum of $46 which he claimed in his invoices, and further that he was not entitled to claim persons as Medicaid patients who personally paid him cash for any of the treatments which they received.

To supplement the proof provided by the fee schedule and the patients' testimony, the prosecutor called Dr. David Davidson, former podiatry consultant to the Erie County Department of Social Services, as an expert on Medicaid billing practices. Based on a series of hypothetical questions formulated by the prosecutor regarding each of the 29 patients, which questions assumed the veracity and accuracy of their respective testimony, Dr. Davidson gave his opinion as to the amounts properly chargeable by and reimbursable to defendant and the amount of the "overbilling" in each instance.[*] After the last hypothetical

---

[*] Defendant, relying upon our holding in *People v Montesano* (84 AD2d 369, app dsmd 58 NY2d 736), argues that Dr. Davidson's opinion testimony was inadmissible. While our holding in *Montesano* may arguably apply here, defense counsel did not object to the substance of Dr. Davidson's testimony, and indeed effectively waived any claim of error by making him his own witness on cross-examination and by conceding in his closing statement that because of the complexities of the case there was a need for

question and answer, Dr. Davidson testified that the "over-billing" totaled the sum of $2,203.70. At least $354.20 of the amount invoiced was described by Dr. Davidson as nonreimbursable because defendant did not make a plaster cast of the feet of patients who were prescribed foot appliances. Another $805.50 of this amount was disallowed because defendant received cash payments from certain of the patients. However, the trial court later found that disallowing reimbursement to defendant under the Medicaid fee schedules for these reasons is improper. We consider these items separately.

### 1. FOOT APPLIANCES.

Under the Medicaid fee schedule, a "foot mold, balance, inlay support (e.g., pedograph, phenophthalein)" is a "P602" appliance known as an orthotic which is billable in the amount of $46 which sum includes "necessary fittings and adjustments". A "dynamic functional or acrylic appliance" is classified as a "P602B" appliance and is billable in the amount of $13.80. The principal distinction between the two appliances is that while the P602 orthotic is a rigid or semirigid three-dimensional appliance designed to "change the way the foot functions or bears weight", a P602B appliance, such as a "molopad", is made of impressionable material and does not redistribute weight. At least 10 patients testified that they received foot appliances from defendant and one patient testified that although she was measured for an appliance and contacted to pick it up, she did not do so.

There was no dispute at trial that P602 orthotics, rather than P602B type appliances, were made for each of these patients. The dispute centered upon whether defendant was entitled to claim reimbursement for these appliances at the P602 rate of $46 when he did not make, for measurement purposes, a plaster cast of his patients' feet before ordering the appliances from the manufacturer, Saperston Labs. Dr. Davidson testified that if such a cast is not made, the reimbursable rate is $13.80, i.e., the rate charged for P602B type appliances, and not $46, i.e., the rate charged

opinion testimony. The court gave a limiting instruction and charged the jury on the weight to be given to this testimony. We do not deem it appropriate to exercise our discretionary power of review (CPL 470.15, subd 6).

for P602 orthotics. He conceded, however, that P602 orthotics may be made not only from plaster casts, but also from "pedographs", and that doctors are paid for the appliance that they provide and not for the casting of their patients' feet.

A pedograph is a print of the weight-bearing surface of the foot which is made by standing on chemically sensitized paper after a bicarbonate of soda solution has been placed on the foot (Dorland's Illustrated Medical Dictionary [24th ed, 1965]). The paper changes color when the solution contacts it. Dr. Davidson described the pedograph as a "[g]raphic representation of the foot" and said that "[the] area of increased weight bearing [shows] up darker on the paper than [the] area that does not bear such weight."

There was proof adduced that although defendant prepared a tracing of his patients' feet on pedograph paper supplied by Saperston Labs and made certain measurements of their feet, he did not place a bicarbonate of soda solution on their feet before they stood on the paper. Thus, defendant made no graphic representation of his patients' feet on the pedograph paper which he submitted to Saperston Labs. Nonetheless, the defendant's tracings and measurements were utilized by Saperston Labs to make orthotics for these patients. The orthotics thus made were not P602B impressionable appliances, but semirigid P602 orthotics.

Eventually the court rejected Dr. Davidson's interpretation of the fee schedule and charged the jury that "the fee schedules do not require a provider to make an actual mold of a part of the human body * * * the fabrication of the appliance alone, regardless of how the measurements therefor were taken * * * was sufficient to entitle the provider to be, upon his making available to the recipient his services for any necessary fittings and adjustments, to be paid therefor at the rate provided in the fee schedule." Thus, under the law of the case as it was charged to the jury, it was irrelevant on the question of compensation under the fee schedule whether or not defendant made castings of his patients' feet when he measured them for orthotics.

## 2. CASH PAYMENTS.

The $805.50 was disallowed by Dr. Davidson because of his opinion that once a podiatrist receives cash from a patient, "he has no right to bill Medicaid anything". The "Medicaid Guidelines Handbook" in evidence, however, only prohibits the acceptance of "additional fees from any Medicaid eligible patient for services included in the Medical Assistance Program". Moreover, the Medicaid vouchers merely require the certification "that no prerequisites, commissions or allowances of any kind * * * have been or will be paid directly or indirectly in consideration of the procurement of said articles or services; the amounts listed are due and, except as noted, no part thereof has been paid". The trial court ultimately ruled that Dr. Davidson's interpretation of the regulations was in error and instructed the jury that "[w]hile [defendant] must report the [cash] payment * * * in the claim submitted for the visit relative to which made, he does not as I find the law to be forfeit the right to make claims for services subsequently rendered for other conditions."

In our view although these rulings correctly interpreted the regulations and testimony, defendant's conviction of grand larceny was fatally affected by the court's charge. The jury was not informed that Dr. Davidson's erroneous interpretation of the governing Medicaid regulations potentially may have affected over $1,100 of the claimed $2,203.70 allegedly overbilled by defendant, which sum formed the basis of the grand larceny charge. The trial court's corrective instructions were insufficient to dissipate the confusion and prejudice engendered by Dr. Davidson's faulty interpretation of the Medicaid fee schedule.

More damaging, however, insofar as defendant's conviction of grand larceny is concerned, is the court's further instructions to the jury concerning the amount properly billable for foot appliances. The court, although rejecting the prosecution's theory that defendant is entitled only to the sum of $13.80 because he did a tracing rather than a casting of his patients' feet, instructed the jury that even though the "quality of care" was not an issue defendant was entitled to only the sum of $13.80 if he knew that the foot appliances which he prescribed would serve "no useful

purpose" to his patients. This was obvious error since defendant was not indicted for this offense, nor was it the theory of the prosecution. It deprived defendant of his due process right to a fair trial to the extent that he chose not to present any substantial amount of evidence on the "usefulness" of the prescribed foot appliances (cf. *People v Charles,* 61 NY2d 321).

The right of an accused to be tried and convicted of only those crimes and upon only those theories charged in the indictment is fundamental and nonwaivable (*People v Miles,* 289 NY 360, 363-364; see, also, *People v Spann,* 56 NY2d 469, 472-473). No exception is necessary to preserve for appellate review its deprivation (see *People v Patterson,* 39 NY2d 288, 294-295).

The indictment here does not allege that defendant committed grand larceny by billing for unnecessary or useless foot appliances. It only alleges that defendant billed for care, services and supplies which he did not provide. Thus, the necessity of the services provided and the appliances supplied is irrelevant to this count of the indictment. The People's direct case demonstrates that its theory was based on defendant's failure to fabricate a cast of his patients' feet before ordering foot appliances for them. The thrust of the prosecutor's evidence was that a mere tracing of patients' feet does not entitle a podiatrist to claim reimbursement at the P602 rate of $46, but only at the P602B rate of $13.80. The prosecutor made clear this theory in his opening statement and Dr. Davidson explained it under questioning by the prosecutor. The People never pursued the theory that the appliances were not necessary or useful, since this theory was inconsistent with their position that defendant was entitled to any reimbursement.

Finally, we consider defendant's contention that the extent and scope of prosecutorial misconduct deprived him of his fundamental right to a fair trial. Reversal on grounds of prosecutorial misconduct "is mandated only when the conduct has caused such substantial prejudice to the defendant that he has been denied due process of law" (*People v Mott,* 94 AD2d 415, 419). In this case, the misconduct was not pervasive and was limited in nature. Many of

the alleged errors in the prosecutor's summation are viewed by us as fair comment made in response to defense counsel's closing statement. Furthermore, except for two instances which occurred during the direct case, no objection was made by defense counsel. Where an objection was made, the prosecutor apparently realizing his error, extended an apology for his conduct and immediately pursued another line of inquiry. The record establishes that the prosecutor improperly forced defendant on cross-examination to characterize the People's witnesses as liars (see *People v Balkum,* 94 AD2d 933; *People v Ochoa,* 86 AD2d 637; *People v Guidice,* 83 AD2d 756) and carried this misconduct over into his summation to bolster the credibility of his witnesses and to denigrate the defense (see *People v Stewart,* 92 AD2d 226, 230-231). However, since no objection was made, no question of law has been preserved for our review. (CPL 470.05, subd 2; *People v Nuccie,* 57 NY2d 818.) We do not believe that the cumulative effect of the asserted instances of misconduct on the part of the prosecutor prejudiced the verdict and deprived defendant of a fair trial, and we decline to reverse defendant's conviction in the interest of justice (see *People v McCormick,* 100 AD2d 723).

■ Other issues raised by defendant have been examined and found to be without merit. In particular, we hold that defendant's employees were not accomplices as a matter of law and that the trial court properly left it to the jury to resolve this issue as a question of fact (see *People v Wheatman,* 31 NY2d 12, cert den 409 US 1027; see, also, *People v Spiegel,* 60 AD2d 210, affd 48 NY2d 647).

■ In conclusion then, we find reversible error in the trial court's instructions to the jury on the charge of grand larceny in the second degree. This error, however, does not pertain to the false filing counts of the indictment, and on these charges, contrary to defendant's contention, there was sufficient proof of guilt. Accordingly, the judgment of conviction should be modified by reversing defendant's conviction of grand larceny in the second degree and a new trial should be granted limited to that count of the indictment.

HANCOCK, JR., J. P., DENMAN, BOOMER and O'DONNELL, JJ., concur.

Judgment unanimously modified, on the law and facts, and, as modified, affirmed, in accordance with opinion by Schnepp, J.