*23 OPINION OF THE COURT
Frederic S. Berman, J.
The defendant, Barry Horney, a New York City transit police officer, was convicted, after a jury trial, of assault in the second degree (Penal Law, § 120.05, subd 2) on December 2, 1983. The defendant now seeks to set aside the verdict, pursuant to CPL 330.30 (subds 1, 2) on the grounds that numerous incidents of jury misconduct and misconduct of others in relation to the jury deprived him of his constitutional and statutory right to a fair trial.
Defendant has alleged a multitude of instances of misconduct by jurors and others both prior to and during deliberations. These can be categorized as follows: (1) the physical and mental incompetence of two jurors which rendered them unable to deliberate and to be effectively polled; (2) possible hidden biases that did not surface during voir dire; (3) impermissible predeliberation comments and prejudgment of the case; (4) extra deliberation conversations amongst jurors in their hotel rooms; (5) a newspaper containing a headline concerning police brutality was viewed by some members of the jury during deliberations and (6) an unauthorized communication between a court officer and members of the jury was made.
FACTUAL BACKGROUND
The defendant was indicted for assault in the second degree for using excessive force in effecting an arrest of one Ronald Dixon in a subway station at 34th Street and Seventh Avenue in Manhattan on September 13,1982. The trial began on November 3,1983, and the case was submitted to the jury on November 29,1983. The jury deliberated for four days before returning a verdict of guilty on December 2, 1983.
On December 6, 1983, defendant moved orally to set aside the verdict, alleging improper conduct by jurors, under CPL 330.30 (subd 2). Defendant’s motion was prompted by a communication to defense counsel by juror No. 2, which indicated that there may have been some irregularities in the conduct of the jury throughout the trial which would render the verdict unconstitutionally *24 infirm. The motion was renewed formally on papers filed January 3, 1984. Following the People’s response, this court concluded that, given the numerous allegations of impropriety (including sworn affidavits by at least six jurors), a hearing was required. (People v Ciaccio, 47 NY2d 431; People v McCurdy, 86 AD2d 493; People v Cadby, 75 AD2d 713.)
Subsequently, hearings were held on February 6, 7, and 10, 1984, at which all 12 jurors and three alternates testified. The matter was adjourned until April 9, 1984, to afford counsel an opportunity to submit briefs and make argument.
LAW
It has long been a general rule in New York that jurors may not impeach their verdicts by affidavit or testimony. (People v De Lucia, 15 NY2d 294, 296; People v Brown, 48 NY2d 388; People v Smith, 87 AD2d 357, affd 59 NY2d 988.) The rule serves to enforce several public policies. It is based on the assumption that the sealing of jurors’ lips guarantees finality of jury verdicts as well as protection of the jury from posttrial harassment. It also fosters open discussion among jurors in their deliberation. (People v De Lucia, supra; see O’Connor, Jury Impeachment of Verdicts in NY, NYLJ, Feb. 29, 1980, p 1, col 1.)
This rule against impeachment of verdicts encompasses the ways the individual juror was influenced or the effect on mental processes. (People v Jacobson, 109 Misc 2d 204; Parker v Gladden, 385 US 363; Stein v New York, 346 US 156.)
In safeguarding the sanctity of verdicts, the Court of Appeals has stated that “[w]ith regard to juryroom deliberations, scarcely any verdict might remain unassailable, if such statements were admissible. Common experience indicates that at times articulate jurors may intimidate the inarticulate, the aggressive may unduly influence the docile. Some jurors may ‘throw in’ when deliberations have reached an impasse. Others may attempt to compromise. Permitting jurors to testify regarding such occurrences would create [havoc]”. (People v De Lucia, 20 NY2d 275, 278; People v Smith, 87 AD2d, at p 359.)
*25 Public policy reasons for not invading the jury deliberations, therefore, must ordinarily override possible injustice to a defendant, for the jury system itself is at stake. (See, also, People v Jacobson, 109 Misc 2d 204, supra; People v Brown, 48 NY2d 388, supra.)
An exception to this rule has been recognized in cases involving the introduction of extraneous material before the jury, or, in other words, “where a jury’s deliberation is affected by ‘outside influence’” (e.g., People v Smith, 87 AD2d, at p 359; Parker v Gladden, 385 US 363, supra [comments by court personnel on the merits of the case]; People v Brown, 48 NY2d 388, supra [juror’s performing experiments on their own and reporting results to rest of jury]; People v De Lucia, 20 NY2d 275, supra; People v Crimmins, 26 NY2d 319 [where jurors made unauthorized visits to the scenes of the alleged crimes]).
CPL 330.30 states that the court may set aside the verdict upon the grounds: “2. That during the trial there occurred, out of the presence of the court, improper conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict”.
This statute has been interpreted to mean that not every misstep by a juror will require a court to vacate a verdict, but only when there has been improper conduct which may have affected a substantial right of the defendant. “[0]nly those acts which impair a defendant’s right to a fair and due consideration of the case by a jury will compel judicial interposition between verdict and sentence.” (People v Phillips, 87 Misc 2d 613, 624, affd 52 AD2d 758, mot for lv to app den 39 NY2d 949; People v Catalonotte, 67 Misc 2d 351; People v Brown, 48 NY2d, at pp 393-394.)
In each case, the facts and circumstances must be examined (without inquiry into the mental processes of the jury) to determine whether or not the defendant has been prejudiced. (People v Pickett, 61 NY2d 773; People v Hooker, 118 Misc 2d 760; People v Ciaccio, 47 NY2d 431, supra; People v De Lucia, 15 NY2d 294, supra; People v Jacobson, 109 Misc 2d 204, supra.)
*26 The defendant has the burden of proving by a preponderance of the evidence every fact essential to support a motion to set aside a verdict (CPL 330.40, subd 2, par [g]).
PHYSICAL AND MENTAL COMPETENCE
In reviewing these “categories” of jury misconduct, as claimed by the defendant, it is clear that, at the outset, this court must reject defendant’s claim that juror No. 2 and juror No. 3 were physically and mentally incompetent to deliberate as jurors. Not only are these allegations not supported by the record, but any inquiry would be beyond the permissible scope of the exception to the rule of nonimpeachment of jury verdicts. A court may not delve into the mental processes of a juror nor into the deliberations of the jury acting as a whole (see People v Pickett, 61 NY2d 773, supra).
That a juror now has a change of heart, or asserts that he was coerced into the verdict or that he even believes in the defendant’s innocence, will not affect a verdict and must be ignored in determining the defendant’s motion (People v Pickett, 61 NY2d 773, supra; People v Jacobson, 109 Misc 2d 204, supra; Klimes v United States, 263 F2d 273; United States v Grieco, 261 F2d 414; United States v Kohne, 358 F Supp 1046). The appropriate time for the two jurors to have raised these issues was when the verdict was announced in open court and the jurors polled.
PREEXISTING BIASES
Defendant’s contention that three jurors did not answer questions on voir dire truthfully so as to deprive him of his right to make challenges also must be rejected. There is no evidence on the record to support this allegation.
The remaining categories of juror misconduct deal with the type of outside and extraneous influences that warrant close scrutiny in determining whether or not defendant’s rights were substantially impaired. Since this court is confronted with numerous incidents of misconduct, it is necessary to view their effect, individually and cumulatively, on defendant’s right to a fair trial (People v Saunders, 120 Misc 2d 1087).
*27 PREDELIBERATION COMMENTS
The duty of a jury not to discuss the case before summations and the court’s charge is an important one. “It appears to derive not only from the statutory admonition * * * but also may, perhaps, be rooted in defendant’s right under our State Constitution to have his guilt or innocence determined by a jury of 12 persons, all of whose deliberations are to be carried on as a body of 12.” (People v Gordon, 77 AD2d 662, 664; see People v Ryan, 19 NY2d 100.) The prejudice to defendant lies in the possibility that some members of the jury have formed conclusions about the case before summations and charge (People v Saunders, 120 Misc 2d 1087, supra; People v Marrero, 83 AD2d 565; People v Gordon, 77 AD2d 662, supra). Also, the verdict may have been affected by outside influences, such as opinions of alternates or extraneous materials (People v Marrero, 83 AD2d 565, supra).
The evidence at the posttrial hearing clearly establishes that, despite the daily admonitions by this court during the trial not to discuss the case, nor permit anyone to express any opinions about the case, there were, in fact, numerous predeliberation comments made by various jurors on many different occasions. Not only was there testimony on this subject by several regular jurors, but even more compelling is the testimony of the three alternates. Any comments which they heard had to be made prior to deliberations. It is also clear from the content of these statements that these premature discussions might well have prejudiced the defendant.
More than a dozen different predeliberation comments were made throughout the course of the trial. Among them, juror No. 7 told several of the jurors that she knew that one of the defense attorneys had a very good reputation; several of the jurors saw the complainant on the street and informed the other jurors of that fact; some jurors wonderpd why the complainant was not in court every day and why he was free when there were outstanding warrants against him; several of the jurors made comments concerning the physical appearance of two witnesses; several of the jurors commented on the defendant’s testimony concerning the profits from his health food store; *28 some jurors speculated that the defendant brought his children to court to muster sympathy. Comments were made concerning the differences of the various witnesses in recounting the incident in question.
While it can be argued that no one of the above statements, standing alone, would warrant the relief sought herein, several other predeliberation statements require greater scrutiny. Several jurors discussed the defendant’s physical condition and the fact that he hit the complainant with his nightstick because the defendant was too fat to chase him. In addition, a juror announced that the defendant was unable to use his handcuffs properly because of his weight. Of even greater significance is that juror No. 10 stated prior to deliberations that he was going to write to the Transit Authority or the Mayor to complain about the defendant’s continued status as a police officer. At the hearing, that juror explained that he was very critical of the police department for allowing a police officer to be as overweight as the defendant. Although juror No. 10 stated that he had not prejudged the defendant’s guilt, in fact at least four other jurors heard this comment. Since the defendant’s justifiable use of force in arresting the complainant was the critical issue in the case, there is no way of knowing what influence these comments had on the minds of the other jurors.
Furthermore, it was learned at the hearing that juror No. 12 recounted to other jurors an incident of which he was aware involving police officers covering up for each other. Considering that at least 10 police officers testified during the trial and there is evidence that at least two jurors, prior to deliberations, expressed doubts about the credibility of the defendant’s supervising officer, Sgt. Wegweiser, it is likely that this comment could have prejudiced the defendant in the minds of some of the jurors.
In addition, one of the alternates testified at the hearing that, during the trial, a juror told her that it was unfair of the defendant to have hit the complainant.
It is this type of prejudgment that the law seeks to avoid by imposing on the trial court the obligation to admonish jurors not to discuss the case or come to any conclusions prior to deliberations. (People v Marrero, 83 AD2d 565, *29 supra; People v Gordon, 77 AD2d 662, supra; People v Saunders, 120 Misc 2d 1087, supra.)
DISCUSSIONS WHILE AT THE HOTEL
Because of the length of deliberations, the jurors were sequestered three nights at a hotel. Before being sent there each night, the court instructed the jurors to cease their deliberations and not discuss the case until their return to the jury room the following morning. Jurors No. 2 and No. 11 both testified that they had a 10- to 20-minute discussion on the merits of the case in their hotel room, including the testimony and credibility of crucial witnesses, and engaged in a demonstration of certain of the defendant’s actions. It was also revealed that two others, jurors No. 3 and No. 7, held discussions in their hotel rooms on the merits of the case. What is crucial is that all of these conversations took place at a time when the jurors differed on their verdicts. It was clearly a serious error for these jurors to have continued to deliberate without the presence of all 12 jurors.
Unconvincing is the People’s argument that no extended “discussion” of the case took place prior to deliberations. It is true that all of the jurors testified that these comments were made and then dropped. But, in fact, many jurors testified that a fellow juror would step in and remind the jury of the court’s instructions not to discuss the case.
Also unpersuasive is the People’s position that all of these comments were innocuous, isolated remarks that only related tangentially to the case.
NEWSPAPER HEADLINE
It is unclear to what extent the viewing of a headline of a newspaper concerning police brutality during the final day of deliberations may have substantially prejudiced the rights of the defendant. The newspaper was on a chair situated at the entrance to the jury room.
Five jurors saw the newspaper headline. Juror No. 10 remarked to juror No. 12 that someone should remove it from sight so that it might not cause a scandal. Juror No. 2 saw the headline and testified that it influenced his vote (he was the last holdout). Juror No. 7 testified that she thought the content related to the jury’s deliberation, and *30 juror No. 11 saw the article and thought to himself that the topic was inescapable.
The Court of Appeals in People v Moore (42 NY2d 421, 433) has stated that the potential for prejudice from media publicity is most tenuous when it involves reports of similar crimes committed by other individuals, even when it involves groups associated with the defendant.
In the instant case, we have an article dealing with the general subject matter of the case, actually seen and read by five jurors on the last day of deliberations, with one juror specifically saying he was influenced by it. The presence of the article was not discovered until after the jury had been discharged, leaving no opportunity for a cautionary instruction by the court or an examination by counsel to determine what harm, if any, had been done. It is true that this is not a situation where the trial has been poisoned by news coverage (see Irwin v Dowd, 366 US 717); however, at least some jurors were exposed to information that was not presented at trial and would not be admissible at trial.
COURT OFFICER’S REMARK
Finally, defendant urges reversal on the ground that there was an ex parte communication between a court officer and at least three jurors that if no verdict were reached by Friday, the jury would be sequestered over the weekend, deliberating on Saturday and electing among themselves whether to do so on Sunday. In addition, other jurors were told of the officer’s remark. This instruction was neither authorized by the court nor made known to counsel or the court until after the verdict was returned. Accordingly, neither the court nor defense counsel had the opportunity to challenge its accuracy or give curative instructions.
CPL 310.10 specifically provides in part that: “Except when so authorized by the court or when performing ad-ministerial duties with respect to the jurors, such court officers or public servants, as the case may be, may not speak to or communicate with [the jury] or permit any other person to do so.”
In reviewing the case law on this matter, two cases prove to be strikingly similar to the situation at hand. In People v *31 Ciaccio (47 NY2d 431, supra) a court officer commented to the jury that the Judge had stated that a lot of time and money had been invested in the case and they should keep deliberating. In People v Eadie (83 AD2d 773), which was a consolidated appeal of two cases, People v Cadby (75 AD2d 713, supra) and People v Eadie (75 AD2d 714), a court officer, at the direction of the court, told the jury at 11:00 p.m. on the first night of deliberations that if they had not reached a verdict they would be sequestered for the night. In both cases, new trials were granted.
The Court of Appeals in Ciaccio (supra) asserted two major grounds for granting a new trial. First, neither defendant nor counsel were present, and in a criminal proceeding a defendant has an absolute right to be present with counsel “ ‘whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge’ ”. (People v Ciaccio, 47 NY2d, at p 436, citing Snyder v Massachusetts, 291 US 97, 105-106; NY Const, art I, § 6.) Second, that such communications for other than administerial duties are specifically prohibited by statute (CPL 310.10). In addition, the Supreme Court has held that such ex parte communications are reversible error (Parker v Gladden, 385 US 363, supra).
In People v Eadie (supra), in addition to the grounds already mentioned,, the court added that it is possible that a jury could interpret such remarks as coercive and prejudicial (People v Eadie, 83 AD2d, at p 774; see, also,People v Perfetto, 96 AD2d 517; People v Mott, 94 AD2d 415). The court in People v Cadby explained that “While a court may instruct the jury on the possibility of sequestration provided it is not construed as a threat or a prejudicial suggestion to reach an agreement * * * such an ex parte communication by court personnel violates CPL 310.10 prohibiting court officers from speaking to or communicating with jurors except when so authorized by the court or when performing administerial duties with respect to the jurors.” (75 AD2d, at p 714.)
The People contend that even if such an error occurred, it was nevertheless harmless. We disagree. Juror No. 2 unequivocally stated that he was adversely influenced by this instruction. The communication itself violated the defen *32 dant’s constitutional right to be present at all stages of proceedings against him. Because no record of the communication was made, its coercive effect cannot be definitively explored (see People v Mott, 94 AD2d 415, 420-421, supra), and it is not known whether the instruction prevented any juror from changing his vote. The verdict was returned at 5:00 p.m. on Friday on the eve of the weekend. The accuracy of the officer’s instruction is irrelevant; what is relevant is that an improper and possibly coercive instruction was made which violated the defendant’s constitutional and statutory rights to a fair trial.
CONCLUSION
This court is most reluctant to disturb the announced verdict of a jury in a criminal case. The relief sought here by the defendant should not be easily granted. Only where the facts adduced reveal the likelihood that the defendant’s paramount right to a fair trial has been compromised should a court permit its reluctance to be overcome.
The record herein has revealed an extensive series of prohibited activity. Some by themselves would not warrant the relief sought. Cumulatively, however, the damage to defendant’s entitlement to a fair trial is overwhelming.
The defendant has clearly met his burden of proving by a preponderance of the evidence that he has been prejudiced. To hold otherwise would fly in the face of credible evidence adduced at three days of hearings.
The record is replete with repeated instances of juror and other misconduct which have, both individually and cumulatively, affected a substantial right of the defendant to have a fair trial in accordance with the Constitutions of the United States and the State of New York.
If CPL 330.30 (subd 2) is to have any meaning and significance, then this case clearly cries out for the relief provided by the statute.
Accordingly, the defendant’s motion to set aside the verdict is hereby granted, and a new trial ordered.