# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**1247**

**KA 07-01841**

PRESENT: SMITH, J.P., FAHEY, CARNI, VALENTINO, AND WHALEN, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                          MEMORANDUM AND ORDER

HOWARD S. WRIGHT, DEFENDANT-APPELLANT.

---

DAVID M. KAPLAN, PENFIELD, FOR DEFENDANT-APPELLANT.

SANDRA J. DOORLEY, DISTRICT ATTORNEY, ROCHESTER (GEOFFREY KAEUPER OF COUNSEL), FOR RESPONDENT.

---

Appeal from a judgment of the Supreme Court, Monroe County (Francis A. Affronti, J.), rendered July 10, 2007. The judgment convicted defendant, upon a jury verdict, of murder in the second degree.

It is hereby ORDERED that the judgment so appealed from is affirmed.

Memorandum: On appeal from a judgment convicting him upon a jury verdict of murder in the second degree (Penal Law § 125.25 [1]), defendant contends that the conviction is not supported by legally sufficient evidence. We reject that contention. "It is well settled that, even in circumstantial evidence cases, the standard for appellate review of legal sufficiency issues is whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the [factfinder] on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Hines*, 97 NY2d 56, 62, *rearg denied* 97 NY2d 678 [internal quotation marks omitted]). Here, several witnesses testified at trial that defendant was with the victim in her vehicle before she was killed. The People also presented evidence that the victim was raped in her vehicle, and defendant's DNA could not be excluded from various pieces of evidence recovered therefrom. In addition, the People presented testimony establishing that defendant was seen with the victim's vehicle on the night she was killed, and a witness testified that, the next morning, defendant took him to the place where the victim's vehicle was parked after the victim's death. We thus conclude that there is a valid line of reasoning and permissible inferences that could lead a rational person to the conclusion reached by the jury (*see People v Hernandez*, 79 AD3d 1683, 1683, *lv denied* 16 NY3d 895).

Viewing the evidence in light of the elements of murder in the

second degree as charged to the jury (*see People v Danielson*, 9 NY3d 342, 349), we reject defendant's further contention that the verdict is against the weight of the evidence (*see generally People v Bleakley*, 69 NY2d 490, 495).  Although an acquittal would not have been unreasonable, it cannot be said that the jury failed to give the evidence the weight it should be accorded (*see generally id.*).

Defendant failed to preserve for our review his contention that he was denied a fair trial based on prosecutorial misconduct on summation (*see* CPL 470.05 [2]; *People v Stanley*, 108 AD3d 1129, 1131), and we decline to exercise our power to review that contention as a matter of discretion in the interest of justice (*see* CPL 470.15 [6] [a]).  Finally, contrary to defendant's contention, we conclude that the evidence, the law and the circumstances of this case, viewed in totality and as of the time of the representation, establish that he received meaningful representation (*see People v Bergman*, 70 AD3d 1494, 1495, *lv denied* 14 NY3d 885; *see generally People v Baldi*, 54 NY2d 137, 147).

All concur except FAHEY and CARNI, JJ., who dissent and vote to reverse in accordance with the following Memorandum:  We respectfully disagree with the conclusion of our colleagues that we should not exercise our power, as a matter of discretion in the interest of justice, to review defendant's contention that he was deprived of a fair trial based on prosecutorial misconduct.  Upon our review of that contention (*see* CPL 470.15 [6] [a]), we conclude that the prosecutor's mischaracterization on summation of DNA evidence linking defendant to the victim's murder is reversible error.  We also conclude that defendant was denied effective assistance of counsel as a matter of law based on defense counsel's failure to object to that prosecutorial misconduct.  We therefore dissent and would reverse the judgment of conviction and grant a new trial on the first count of the indictment.

Before we address the incidents of prosecutorial misconduct, it is first necessary to address the evidence on which those incidents are based.  As the majority notes, the People "presented evidence that . . . defendant's DNA could not be excluded from various pieces of evidence recovered [from the victim's vehicle]."  At trial, the People's forensic expert, who analyzed defendant's DNA sample, described the two types of DNA testing used in this case—mitochondrial DNA analysis and YSTR DNA analysis.  "[M]itochondrial DNA is not unique to any one individual[,] [and] everyone in a maternal line will share the same mitochondrial DNA" (Wes R. Porter, Expert Witnesses: Criminal Cases, § 8:22).  By contrast, YSTR DNA analysis involves only the Y chromosome, and the genetic testing based on YSTR DNA analysis produces results only with respect to male individuals.  Those more limited results are a natural consequence of the human genetic constitution inasmuch as a female inherits an X chromosome from each parent, whereas a male inherits an X chromosome from his mother and a Y chromosome from his father (*see* Forensic DNA Evidence:  Science and the Law, ch 7:1).  Absent "mutations, 95% of the genetic information on the Y chromosome is left unchanged from one generation to the next" (*id.*) and, "[b]ecause of [that] conservation, all male relatives from the same paternal line will have the same genetic information in the

non-recombinant region of their Y chromosomes" (*id.*).   YSTR DNA "testing [thus] produces results that are specific to male individuals only" (*id.*).

The People's forensic expert acknowledged the two above-mentioned types of DNA analysis at trial, but she did not speak at length about a third type of DNA analysis—autosomal, which involves analysis of non-sex chromosomes and which permits "a statistical expression of the [DNA] profile's rarity in certain human populations" (*id.* at ch 5). Courts have observed that " '[t]he major difference between autosomal . . . DNA analysis and [YSTR] DNA analysis is in the interpretation and application of the test results' " (*People v Stevey*, 209 Cal App 4th 1400, 1413, quoting *People v Calleia*, 414 NJ Super 125, 145, 997 A2d 1051, 1062-1063, *revd on other grounds* 206 NJ 274, 20 A3d 402), and that "[YSTR DNA] testing . . . appears to have limited usefulness in *identifying* someone by a DNA match, but it may be useful for *excluding* a person" (*Moore v Commonwealth*, 357 SW3d 470, 491-492 [emphasis added]; *see Calleia*, 414 NJ Super at 145-147, 997 A2d at 1063-1064).   Given its "high probability of identifying an individual as the DNA source," autosomal DNA testing "is the preferred method of analysis" (*Calleia*, 414 NJ Super at 146, 997 A2d at 1063).

By way of illustrating the above limitations of YSTR DNA analysis in the context of this case, we note that the People's forensic expert testified on direct examination that YSTR DNA analysis could not exclude defendant and the victim's husband as contributors to a sample collected from the ligature that bound the victim's hands; that YSTR DNA analysis of a sperm fraction from the vaginal swab collected from the victim could not exclude defendant's accomplice; and that YSTR DNA analysis could not exclude the victim's husband, defendant's accomplice and defendant as contributors to a sample collected from the victim's underwear.   Further, on cross-examination, the People's forensic expert acknowledged that no typical statistical calculations are done in YSTR DNA testing, and that the "whole profile" is "compare[d] . . . to a database . . . to approximate how common or rare that particular profile might be found in the male population." None of the DNA evidence that tied defendant to the victim's murder was backed by any statistical calculations.

Notwithstanding the circumstantial and inconclusive nature of the above DNA evidence, the People presented it as their strongest proof linking defendant to the victim's murder.   The People's remaining evidence of defendant's guilt was equally circumstantial, establishing only that the victim's body was found in a driveway; that the victim had been strangled to death with a shoelace; that the victim's hands had been bound behind her back with a ligature; and that, the day before her body was discovered, the victim, who tested positive for cocaine after her death, had been seen with defendant and codefendant, two cocaine dealers who were also observed in the victim's car without the victim a few hours before the victim's body was discovered.

Consequently, during her summation, the prosecutor relied heavily on the DNA evidence.   She began her discussion of that proof by

arguing to the jury that defendant and his accomplice "thought that they had gotten away with murder, but they left their DNA all over the crime." After conceding that there was no statistical calculation available for the DNA results from the vaginal swab, the prosecutor noted that there had been only two contributors to the sperm fraction from the swab, which "matched the YSTR/DNA profile of the defendant and of [defendant's accomplice]." The prosecutor added that the semen collected from the victim's underwear contained a mixture of DNA, which included contributions from both defendant and his accomplice.

With respect to the hand ligature, the prosecutor noted that the People's analysts were unable to obtain a complete DNA profile from that evidence, but "at four locations, there was able to be detected the presence of a Y chromosome . . . [E]very single number that they were able to determine, and they were able to determine partial profile matches, is that of [defendant] and [the victim's husband]." After noting again that there was no statistical calculation available, the prosecutor further argued to the jury that, according to the People's forensic expert, defendant "could not be excluded as a contributor to the mixture on the ligature."

From there, the prosecutor went further, referring to a chart listing the YSTR DNA profiles of several different potential matches and alleging that "the only one who matches the DNA profile on the ligature is [defendant]." Arguing that such fact was probative and not coincidental, the prosecutor further claimed that there was "no reasonable explanation for [defendant's] DNA on that ligature that bound [the victim's] hands." In closing her discussion of the DNA evidence, the prosecutor also argued to the jury that defendant's "sperm" had been in the victim's vagina and on the victim's underwear, and that his DNA profile was "included on the ligature that bound [the victim's] hands together." Finally, the prosecutor added: "The defendant's DNA is inside [the victim], on her underwear, on the ligature that binds her hands . . . When you put it all together, members of the jury, it is common sense and there is only one conclusion that you can reach, and that is guilty."

"Reversal based on prosecutorial misconduct is 'mandated only when the conduct [complained of] has caused such substantial prejudice to the defendant that he has been denied due process of law' " (*People v Jacobson*, 60 AD3d 1326, 1328, *lv denied* 12 NY3d 916). "In measuring whether substantial prejudice has occurred, one must look at the severity and frequency of the conduct, whether the court took appropriate action to dilute the effect of that conduct, and whether review of the evidence indicates that without the conduct the same result would undoubtedly have been reached" (*People v Mott*, 94 AD2d 415, 419).

In light of the circumstantial nature of all of the evidence against defendant, we cannot conclude that the jury would have reached the same result had not the prosecutor both mischaracterized and emphasized the DNA evidence on summation, which evidence the People made the linchpin of their case. Here, the testimony of the People's forensic expert put defendant in only a statistically-undefined *group*

of people whose DNA could have been found on the victim's underwear, on the ligature, and in the sperm fraction from the vaginal swab.  In other words, that evidence placed defendant in a *class* of people that could have contributed to the DNA, but the prosecutor argued to the jury that the analysis of the DNA *established* defendant as the DNA's contributor.  We conclude that the prosecutor's willful and repeated mischaracterization of evidence of class as evidence of exactitude was misconduct that could have " 'tip[ped] the scales against defendant' " (*People v Elliott*, 294 AD2d 870, 870, *lv denied* 98 NY2d 696).  We cannot conclude that the same result herein "would undoubtedly have been reached" absent that misconduct (*Mott*, 94 AD2d at 419).

    We further conclude that, under the circumstances of this case, defense counsel's failure to object to the prosecutor's remarks on summation deprived defendant of meaningful representation.  "A single error may qualify as ineffective assistance, but only when the error is sufficiently egregious and prejudicial as to compromise a defendant's right to a fair trial" (*People v Caban*, 5 NY3d 143, 152; *see People v Atkins*, 107 AD3d 1465, 1465, *lv denied* 21 NY3d 1040).  "In order to sustain a claim of ineffective assistance of counsel, a court must consider whether defense counsel's actions at trial constituted egregious and prejudicial error such that defendant did not receive a fair trial" (*People v Oathout*, 21 NY3d 127, 131 [internal quotation marks omitted]).  Here, we conclude that defense counsel's failure to object to the prosecutor's baseless transformation of evidence that defendant was in a group or class of people that could have contributed to the subject DNA samples to evidence that defendant was the sole possible contributor to those samples was so egregious and prejudicial that defendant did not receive a fair trial.  In our view, there is no strategic or other legitimate explanation for that shortcoming (*see People v Benevento*, 91 NY2d 708, 712), and we conclude that defendant was denied the right to effective assistance of counsel (*see generally People v Baldi*, 54 NY2d 137, 147).

    Consequently, for the foregoing reasons, we would reverse the judgment on the law based on ineffective assistance of counsel.  We would also reverse the judgment as a matter of discretion in the interest of justice and on the law based on prosecutorial misconduct.  Further, we would grant defendant a new trial on the first count of the indictment.

Entered:  March 21, 2014                    Frances E. Cafarell
                                            Clerk of the Court