**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3880-16T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JONATHAN S. JAMES, a/k/a
JOHNATHAN JAMES,

    Defendant-Appellant.

_____

Argued August 13, 2019 – Decided September 18, 2019

Before Judges Messano and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 12-09-0683.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Meredith L. Balo, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Jonathan James of the first-degree murder of Orlando Hernandez, first-degree attempted murder of Antonio Hernandez, and related weapons offenses. The judge imposed a thirty-year term of imprisonment with thirty-years of parole ineligibility on the murder conviction, and a consecutive thirteen-year term of imprisonment with an eighty-five percent period of parole ineligibility on the attempted murder conviction.[1] Before us, defendant raises the following points for our consideration:

> POINT I
>
> DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE JUDGE ALLOWED THE STATE TO PRESENT AN EXPERT'S OPINION THAT DEFENDANT COULD NOT BE EXCLUDED AS THE SOURCE OF THE DNA ON THE HAMMER OF THE GUN AND THAT ONLY ONE[-]IN[-EIGHTEEN] AFRICAN-AMERICANS WOULD HAVE THE SAME GENOTYPE, BECAUSE THOSE CONCLUSIONS WERE ADMITTEDLY BASED UPON A PARTIAL DNA PROFILE WITH "LOW[-]LEVEL" RESULTS, AND SUPPORTED BY A STATISTICAL ANALYSIS[,] WHICH ASSUMED THAT NONE OF THE [TWENTY-SIX] MISSING ALLELES WOULD

---

[1] After merging one of the convictions on the weapons offenses, the judge imposed a concurrent sentence on the other.

BE INCONSISTENT WITH DEFENDANT'S PROFILE.[2]

POINT II

IN IMPOSING A CONSECUTIVE SENTENCE FOR ATTEMPTED MURDER, THE JUDGE FAILED TO PROPERLY APPLY THE YARBOUGH[3] FACTORS OR TO CONSIDER TESTIMONY[,] WHICH SUGGESTED THAT THE SHOOTER WAS ONLY ATTEMPTING TO HARM ONE INDIVIDUAL.

Having considered these arguments in light of the record and applicable legal standards, we affirm.

I.

Late in the evening of March 23, 2012, Antonio[4] and a male and female acquaintance were standing on a sidewalk in front of a housing complex in Elizabeth. Orlando, who Antonio knew, approached, and the two men greeted each other with a hug. At that point, several shots rang out, and everyone ran. Bullets struck Antonio in the arm and lower back. At the time, he did not know Orlando was fatally wounded by a gunshot to the head. Antonio described the

---

[2] We have eliminated the sub- and sub-sub-point headings in defendant's brief.

[3] State v. Yarbough, 100 N.J. 627 (1985).

[4] To avoid confusion, we use the first names of the two victims. We intend no disrespect by this informality.

shooter standing behind Orlando as "possibly . . . African-American" and wearing a "dark-colored sweater[,]" but otherwise he could not identify the man.[5]

Elizabeth Police Officers Jose Montilla and Rony Cruz were on patrol when they heard shots fired. As Montilla exited his police car, he saw people running. "[A] tall [b]lack male" wearing a "dark-colored top, sweater, with jeans" ran toward Montilla. Montilla ordered the man to stop, but he ignored the command, and Montilla gave chase. When the man ran down the driveway of a house, Montilla stopped and "could hear [the man] going through the backyards." Montilla broadcasted the direction of flight, telling other officers near the scene "where . . . [the man] was going to come out if he was to continue running." The jury heard taped recordings of the police broadcasts.

Detective Jose Martinez saw defendant "running from in between two houses[,]" apprehended him, and asked for assistance from any officer who could identify the suspect. Montilla responded and identified defendant as the person he had earlier chased. Defendant now wore a white t-shirt and had a car

---

[5] Minutes earlier, Orlando had approached a disinterested citizen who lived close by and asked for money. This man saw Orlando walk toward Antonio and his friends and saw an unidentified man approach the group and start firing. The jury saw surveillance camera footage of portions of the incident. The video is not part of the appellate record.

key, along with other keys, in his pocket. Martinez searched the area and found "a black sweatshirt on the ground" near a stockade fence where he had seen defendant running. Another police officer found defendant's wallet in one of the backyards, and Cruz found a .32 caliber revolver on the front lawn of one of the nearby homes. Subsequent ballistic testing revealed the gun fired the shot that killed Orlando and wounded Antonio, and that one of the unfired cartridges demonstrated a "'light' primer strike," i.e., signifying the "firing pin struck the primer" but with insufficient force "to actually fire the cartridge."

After his arrest, defendant and Alexis Feliciano were housed in the same area of the Union County Jail, discussing what charges each faced. Feliciano saw a copy of defendant's criminal complaint, and told him that he knew Orlando, having grown up with his family, and Antonio, who Feliciano knew from "seeing him around." Defendant explained to Feliciano that he drove by the group of people, saw Antonio, parked his car, walked toward him, and fired. Defendant told Feliciano he did not plan to shoot Orlando but did "because he was there." Defendant said the .32 caliber gun "jammed," and he threw it away before police apprehended him.

While in custody the morning after his arrest, defendant also called his sister in Hillside. He told her where he had parked the family car in Elizabeth

and asked her to retrieve it. The car was parked on the same street where the murder occurred.

The sweatshirt police found near the fence contained DNA evidence on its left cuff. The State's expert, Monica Ghannam, an employee of the Union County Prosecutor's Office (UCPO) Forensic Laboratory, opined defendant was a major contributor to this DNA, and the probability of randomly selecting someone in the African-American population with the same DNA profile was 1-in-690 quintillion. In addition, as we describe in more detail below, Ghannam obtained a "low level" of DNA evidence from the hammer of the revolver. She opined that defendant could not be excluded as a contributor to the sample, and the probability of randomly selecting a member of the African-American population with a similar DNA profile, the random match probability (RMP), was one-in-eighteen.

Defendant did not call any witnesses or testify.

## II.

Defendant moved to preclude the State from introducing evidence of the RMP with respect to the DNA found on the gun. The judge held a hearing outside the presence of the jury pursuant to N.J.R.E. 104(a), at which Dr. Norah

A-3880-16T2

Rudin, Ph.D., a forensic DNA consultant, testified by video for defendant, and Ghannam testified for the State.

Ghannam explained the basic "allelic ladder," and that an individual has "two results" at fifteen areas or loci targeted by her testing. In this case, Ghannam obtained results at "four loci" that were consistent with defendant's DNA, but at each site she was able to retrieve only one side of the allelic ladder. These led her to conclude that the sample was consistent with a single contributor, and "defendant could not be excluded" as a contributor to the sample.

Ghannam explained the "2p" "statistical tool," which serves as "the basis for . . . [RMP.]" She acknowledge limitations on the calculation if only one of the two DNA types at any loci were known. Ghannam explained that the 2p method did not permit her to make any "assumptions" regarding the missing type.

Regarding the DNA samples obtained from the hammer of the murder weapon, Ghannam acknowledged they were "low[-]level" readings, above her laboratory's "analytic threshold" but below "the stochastic threshold."[6] As a

_____

[6] Ghannam explained that these thresholds were "mandated . . . by the different guidelines" generally applicable to laboratories doing DNA analysis. In 2012,

result, although the "2p [analysis was] still valid[,]" Ghannam acknowledged she was "treat[ing] our interpretation very cautiously and very conservatively."

Rudin explained that Ghannam's analysis did not consider the "probability of drop[]out" on the missing alleles, meaning there was no ability to "negatively weight" and account for the other half of the allele being inconsistent with defendant's DNA. Rudin explained that laboratories were moving toward more rigorous analyses to account for allele dropout, and opined that the UCPO laboratory's continued use of "the 2p statistic" was "out of date and archaic," and "r[a]n the risk of a false inclusion." She noted that even when Ghannam conducted her testing in 2012, scholars questioned the failure to account for "false inclusion." When asked about the "value" of Ghannam's RMP, Rudin stated that was "ultimately . . . for . . . the trier of fact to determine."[7]

_____

when she performed her analysis, the UCPO laboratory's "analytical threshold" was "70 RFU," or "relative fluorescent units." Ghannam would not "interpret [results] below that threshold in any manner." At the time of her analysis, the laboratory used a "stochastic threshold" of "300 RFU." Rudin described this as a "threshold below which we're not sure we're detecting all the information." She acknowledged that "the RFU stochastic threshold should be 200 to 250." Three-hundred RFU exceeded the minimum values for a stochastic threshold. Ghannam testified that a result falling between the two thresholds was a "low-level sample."

[7] As noted, Rudin did not testify before the jury.

In a comprehensive oral decision, the judge noted both Ghannam and Rudin recognized an authoritative treatise, which in turn explained that "[e]ven if results [were] obtained from only a few . . . loci, th[e] information may provide ample assistance to either include or exclude the suspect and therefore aid in resolving the case." The judge pointed out that Rudin erroneously construed some passages in the treatise, and concluded Ghannam's explanation of how to account for "allele drop[]out" was "more plausible."

Citing federal, sister state, and New Jersey precedent, the judge considered whether there was a threshold of RMP values below which he should exclude the evidence. He noted that the jury could comprehend the significance of "the vast difference between the statistics with regard to the DNA on the sweatshirt and that found on the gun[.]" The judge concluded the evidence was admissible.

Before us, defendant contends the judge erred because Ghannam's "[u]nderlying [m]ethodology [w]as [n]ot [r]eliable" or "[g]enerally [a]ccepted [i]n [t]he [s]cientific [c]ommunity[.]" He argues the judge admitted the evidence based upon the jury's capability of understanding the RMP rather than analyzing whether the "very limited information" Ghannam developed from the actual sample warranted admission of the RMP. Additionally, defendant argues

that even if the evidence was admissible pursuant to N.J.R.E. 702, its probative value was outweighed by its prejudicial value, and the judge should have excluded it under N.J.R.E. 403. We disagree.

To satisfy N.J.R.E. 702,

> the proponent of expert evidence must establish three things: (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) "the witness must have sufficient expertise to offer the" testimony.
>
> [State v. J.L.G., 234 N.J. 265, 280 (2018) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

Defendant does not argue that Ghannam's testimony failed to satisfy the first and third prongs of the test. In criminal cases, as to reliability, "[t]he test requires trial judges to determine whether the science underlying the proposed expert testimony has 'gained general acceptance in the particular field in which it belongs.'" Ibid. (quoting Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)).

Here, both Ghannam and Rudin acknowledged that among DNA professionals, when Ghannam analyzed the samples from the gun hammer in 2012, the 2p statistical analysis was a recognized method for computing RMP.

At oral argument before us, defendant acknowledged he was not challenging the scientific methodology behind 2p.

Nor does defendant argue that Ghannam's one-in-eighteen RMP is so statistically insignificant as to render it irrelevant. "[C]ourts have been reluctant to enunciate a threshold that delineates the level of statistical significance required for DNA evidence to be admissible." United States v. Graves, 465 F. Supp. 2d 450, 458 (E.D. Pa. 2006) (citing United States v. Morrow, 374 F. Supp. 2d 51, 65 (D.D.C. 2005)). "DNA evidence of low statistical value is probative to show that a defendant cannot be excluded as a contributor to the DNA sample." Ibid. (citing Morrow, 374 F. Supp. 2d at 65). And, as we have noted in other contexts, evidence that "defendant cannot be ruled out" as one who possessed the murder weapon is relevant evidence for the jury to consider, along with the other proofs adduced at trial. State v. Calleia, 414 N.J. Super. 125, 150–51 (App. Div. 2010), rev'd on other grounds, 206 N.J. 274 (2011).

Rather, as we understand it, defendant argues Ghannam's opinions relied upon such limited facts, i.e., four partial alleles, and failed to account for the negative weight of allele dropout, or the possibility that missing values on the four loci could eliminate defendant as the source of the DNA material. As a result, her opinion regarding RMP was neither "reliable nor probative."

11

N.J.R.E. 703 provides that "[t]he facts or data" that an expert relies on "in forming opinions or inferences upon the subject" need "not be admissible in evidence" if "of a type reasonably relied upon by experts in [a] particular field[.]" "The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006). However, "an expert's testimony may [also] be termed a 'net opinion' when the data on which it is based is perceived as insufficient, [or] unreliable[.]" Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3 on N.J.R.E. 703 (2019); see, e.g., Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 300 (App. Div. 1990) (noting that under the "net opinion rule[,]" "expert testimony is excluded if it is based merely on unfounded speculation and unqualified possibilities.").

In this case, Ghannam did not base her opinions upon unfounded speculation, nor did she fail to explain alternative factual assumptions that would lead to other possibilities contradicting her conclusions. In other words, the underlying facts supporting Ghannam's one-in-eighteen RPM were fully exposed, both to the judge in the N.J.R.E. 104 hearing, and ultimately the jury, as were the weaknesses and limitations of those factual underpinnings. We

cannot conclude that the inherent limits of the DNA sample on the hammer of the gun were such as to render inadmissible any expert opinion about defendant's status as a possible contributor or the RPM.

Obviously, once admitted, the jury must decide whether the expert's opinion has sufficient factual support, and, if it not, the jury is justified in rejecting the opinion. State v. Atwater, 400 N.J. Super. 319, 334 (App. Div. 2008). In this case, the jury was properly charged regarding that proposition and its sole fact-finding function as to all the expert testimony in the case.

We also disagree with defendant's claim that the judge improperly weighed the probative value of the evidence against its prejudicial effect. N.J.R.E. 403 provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury[.]" (Emphasis added). In Morrow, the federal district court concluded that the trial court's "careful oversight" ameliorated the "potential prejudice of the DNA evidence . . . to the point where [its] probative value outweighs it[,]" making the admission of "DNA evidence of a low statistical significance . . . proper under a [Federal Rules of Evidence] 403[8]

---

[8] The language of F.R.E. 403 is nearly identical to N.J.R.E. 403: "The court may exclude relevant evidence if its probative value is substantially outweighed

analysis." 374 F. Supp. 2d at 66 (quoting United States v. Chischilly, 30 F.3d 1144, 1158 (9th Cir. 1994)). Here, the judge's repeated instructions to the jury regarding Ghannam's and the other experts' testimony fully ameliorated any prejudice. Additionally, defense counsel's closing argument highlighted for the jury the intrinsic limitations on Ghannam's opinion regarding the RPM.

Finally, even if we are mistaken, and the judge should have excluded Ghannam's opinion about the DNA material on the hammer of the gun, we cannot say its admission requires reversal. As the Court has recently explained, the erroneous admission of expert testimony may nonetheless be "harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' — that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" J.L.G., 234 N.J. at 306 (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)). We may consider whether the error is "harmless in light of the overwhelming evidence of defendant's guilt." Ibid.

In this case, the State's evidence was indeed overwhelming. A disinterested citizen described the shooting. Defendant refused to heed a police

_____

by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury . . . ."

14

command to stop as he ran from the scene, discarding the murder weapon and his outer garment along the route, where defendant's wallet was also found. Defendant's DNA was on the sleeve of that outer garment, and defendant admitted the murder to a jailhouse informant. Defendant called his sister the day after the murder and told her to move the family car parked on the street where the homicide occurred. When viewed in this context, Ghannam's opinion regarding RMP on the murder weapon, admittedly limited by the expert herself, was harmless beyond a reasonable doubt.

We affirm defendant's convictions.

III.

Defendant challenges the judge's decision to impose consecutive sentences. He contends the judge improperly weighed the Yarbough factors, particularly since the murder of Orlando and the shooting of Antonio "were not predominantly independent of each other."

Our "review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011).

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

Furthermore, "trial judges have discretion to decide if sentences should run concurrently or consecutively." Miller, 205 N.J. at 128. See N.J.S.A. 2C:44-5(a). "When a sentencing court properly evaluates the Yarbough factors[9] in light

---

[9] The Yarbough factors are:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as

of the record, the court's decision will not normally be disturbed on appeal."   Id. at 129.

The judge fully explained his reasons for imposing consecutive sentences, noting that defendant fired "at least three shots" toward a group of people, hitting "separate victims."   The judge found defendant committed "separate acts of violence, notwithstanding the proximity of the timing of the acts."

---

to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

[Yarbough, 100 N.J. at 643-44 (1985).]

A sixth factor, imposing "an overall outer limit" on consecutive sentences, was superseded by legislative action.   See State v. Eisenman, 153 N.J. 462, 478 (1998).

17

We find no reason to disturb the judge's exercise of his broad discretion in fashioning the appropriate sentence in this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3880-16T2